UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

ASHLEY K. EVE, *et al.*,

Plaintiffs,

v.

SUPERINTENDENT, INDIANA STATE POLICE, in his official capacity,

Defendant.

No. 1:20-cv-2036 JPH-DML

**Memorandum in Support of Motion for Preliminary Injunction**

**Introduction**

As this Court is undoubtedly aware, the federal government has recently ended the informal moratorium on executions at the United States Prison-Terre Haute ("USP Terre Haute"), the site of the sole execution chamber in the federal prison system. Executions are currently scheduled for August 24 and 26, and September 24 and 26, 2020 and more will undoubtedly occur thereafter. Plaintiffs are individuals and organizations with members who protested ("the protesters") and stood vigil in opposition to the July executions and plan to do so in August and thereafter.[1] They wished to conduct their

[1] The individual protesters, Ashley K. Eve, Abraham J. Bonowitz, Bill Pelke, Karen Burkhart, and Rev. Bill Breeden were all present for the protests and vigils attending the July 13, 15, and 17, 2020 executions and plan to be at the August and future executions. (Dkt. 5-1 ¶¶ 7-14, 19; Dkt. 5-2 ¶¶ 15, 20-24; Dkt. 5-3 ¶¶ 16, 21-2; Dkt. 5-5 ¶¶ 5, 11-14, 19; Dkt. 5-7 ¶¶ 5, 14, 19). The

protest activities on public property opposite the main entrance to the prison, or on contiguous private property that they had received permission to use. However, prior to the scheduled executions the Indiana State Police ("ISP") erected barricades and closed the roads leading to the prison. The protesters were therefore forced to stay almost two miles from the entrance of the prison. There is no cause or excuse for this overly broad "no-protest zone." The actions of the ISP in blocking the roads violate the protesters' First Amendment rights. All the other requirements for the grant of a preliminary injunction are met, and a preliminary injunction must be issued, without bond, so that the protesters may engage in their vigil against the executions on property immediately outside the entrance to the prison.

**Facts**[2]

The Federal Correctional Complex in Terre Haute, Indiana, is the site of a number prisons, including USP Terre Haute. Federal Bureau of Prisons, *Our Locations – FCC Terre Haute*, https://www.bop.gov/locations/search.jsp?q=FCC+Terre+Haute&name=Terre+

---

organizational plaintiffs, Death Penalty Action, the Indiana Abolition Coalition, and the Sisters of Providence of Saint-Mary-of-the-Woods, Indiana, all had at least member present during the protests prior to the July executions and will have members present at the future execution. (Dkt. 5-2 ¶¶ 15, 20-24; Dkt. 5-4 ¶¶ 8, 14, 16-17; Dkt. 5-6 ¶¶ 6-10, 17).

[2] Given that no discovery has yet occurred in this case, the protesters reserve the right to provide supplemental filing prior to, or at, any preliminary injunction hearing.

Haute&facilityType=FCC (last visited August 1, 2020). It is the only place within the federal prison system where executions occur. (Dkt. 5-1 ¶ 3).

After a long period of time when there were no executions, executions within the federal system resumed at USP Terre Haute in July of 2020. (*Id.* ¶ 4). The Federal Correctional Complex occupies a large tract of land and its main entrance lies at the corner of West Springhill Drive and Prairieton Road in Terre Haute as illustrated below:



(https://www.google.com/maps/place/Federal+Correctional+Institution/@39.4100162,-87.4223253,15z (last visited August 2, 2020); *see also,* 5-1 ¶ 7). Immediately contiguous to the right of way, opposite the main entrance to the prison, is a Dollar General store[3]:




(https://www.google.com/maps/search/satellite+photo+dollar+general+4549+State+Rd+63+Terre+Haute/@39.4121445,-87.4470783,1004m/data=!3m1!1e3 (last visited Aug. 2, 2020)).

As noted, the protesters in this case consist of individuals who are opposed to the death penalty and the executions that take place at USP Terre Haute as well as members

[3] There was no objection from the management of the Dollar General store to the protesters using the edge of the store parking lot if necessary. (Dkt. 5-1 ¶ 10). However, given that the total number of persons protesting was no more than 24, it did not appear necessary to utilize the parking lot. (*Id.* ¶¶ 6, 10).

of organizations that are similarly opposed. (*See* note 1, *supra*). To demonstrate their opposition they planned to stand in the public space at the intersection of Springhill Drive and Prairieton Road, as shown above, opposite the main entrance to the prison, on July 13 and on all subsequent execution dates. (Dkt. 5-1 ¶¶ 7, 9; Dkt. 5-2 ¶ 8, 11; Dkt. 5-3 ¶¶ 9, 12; 5-4 ¶¶ 7, 10; 5-5 ¶¶ 6, 9; 5-6 ¶¶ 7; 5-7 ¶¶ 6-9). Although USP Terre Haute is clearly visible from this location, the prison buildings are far away as the grounds are expansive. (5-1 ¶ 7). But this site would allow the protesters to see the prison where the human life was taken. (*Id.* ¶ 15). This is extremely important to the protesters. For example, Rev. Breeden notes the need to have a visual connection to the prison where the execution is occurring as he wants to be a witness for life. (Dkt. 5-3 ¶ 7). Sister Barbara Battista of the Sisters of Providence of Saint Mary-of-the-Woods, Indiana, echoes this sentiment, stating that being in a location where the prison cannot even be seen is not an appropriate location to stand in silent vigil as the sentence is carried out and human life is taken. (Dkt. 5-4 ¶ 15).

However, a number of hours prior to the July 13 and subsequent executions in July, the ISP erected roadblocks at 1st street and Springhill Drive, immediately west of U.S. Highway 41, approximately 1.6 miles from the entrance to the prison, and prohibited the protesters from getting any closer to the prison. (Dkt. 5-1 ¶ 12). Other roads leading to the prison were also barricaded, preventing persons from getting close to prison. (*Id.* ¶ 13).

Therefore, on July 13, 15, and 17, the protesters could not get to the property immediately outside of the prison and instead protested on the right of way near a car dealership on U.S. Highway 41 and on the car dealership's property, far removed from the prison. (*Id.* ¶ 14; 5-2 ¶ 15; 5-3 ¶ 16; 5-4 ¶ 14 ; 5-5 ¶ 14; 5-6 ¶ 12; 5-7 ¶ 14). This was not a satisfactory alternative to the desired site opposite the main entrance to the prison. Not only was the site so far away that the prison is not even visible, but many persons who speed by on U.S. Highway 41 might even understand the connection between the protest and the pending execution. (Dkt. 5-2 ¶ 16; Dkt. 5-3 ¶ 17). It simply was not an appropriate place to stand in silent vigil as a human life is taken. (Dkt. 5-1 ¶ 15). All the protesters have raised similar objections to being pushed so far from the prison. (Dkt. 5- 4 ¶ 15; 5-5 ¶ 15; 5-6 ¶ 13; 5-7 ¶ 15).

The execution planned for July 13 was repeatedly delayed and did not take place until the morning of July 14 and during the evening on July 13 ISP removed the barricades. (Dkt. 5-3 ¶¶ 17-18). The protesters dispersed when it was clear that the execution was probably not going to occur on July 13. (*Id.*¶ 19). Early on the morning of the 14th, Rev. Breeden, knowing that the execution had not yet occurred, drove to the prison and saw that the roadblocks were gone. (*Id.* ¶ 20). He was therefore able to stand at the site of the intersection of Springhill Drive and Prairieton Road and stand vigil as the sentence was carried out shortly after 8:00 a.m. (*Id.*).

The second execution, scheduled for July 15, 2020, was rescheduled for 7 p.m. and a number of protesters were able to get to the site at Springhill Drive and Prairieton Road before the roadblocks were established and stood vigil without disruption. (Dkt. 5-2 ¶ 20). However, those attempting to travel to that site as the roadblocks were being erected were turned away and the protesters were therefore left to the car lot on Springhill Road and U.S. Highway 41. (*Id.* ¶ 20; Dkt. 5-1 ¶ 14). The barricades will go up prior to future executions, and at this point there are executions planned for August 26 and 28 and September 24 and 26, 2020. (Dkt. 5-1 ¶¶ 20, 25).

The BOP has offered to allow protesters, both those for and against the executions, to be bussed into the correctional complex and placed into fenced enclosures. (Dkt. 5-1 ¶ 22; Exhibit 2 to Dkt. 5-1). The BOP dictates that only limited items can be taken onto the buses and that protesters may not take any cell phones or recording devices and may not have any sign made of wood or metal or using metal supports. (Exhibit 1 to Dkt. 5-1). It appears that no food or liquids are allowed. (*Id.*). Additionally, protesters must be present no later than 1:30 for executions that will take place no earlier than 4:00 p.m. (*Id.*). The enclosed area where they are taken includes a portable toilet, hand sanitizer, drinking water, a small tent-like shelter, and bleacher seating. (Exhibit 2 to Dkt. 5-1).

The BOP's proposal is not an adequate alternative for the protesters. For one thing, there is no certainty as to when an execution will occur as there are frequent delays at the last minute due to appeals and other circumstances. (Dkt 5-4 ¶ 19). This means that those

in the enclosures could be there for an unknown about of time and, presumably, could not leave unless the BOP bussed them out. (*Id.*). Moreover, some of the protesters are elderly and do not want to be in the heat for long periods of time. (*Id.*). Nor do they wish, in the era of the coronavirus, to be placed onto a bus with the other protesters. (*Id.*). Additionally, protesters do not want to be dependent on the executioner, the BOP, to transport them in and out of the prison where the execution is occurring. (*Id.*; Dkt. 5-3 ¶ 25). Moreover, there are protesters who may simply not have the time to be placed into the BOP's "pens" and wait. (Dkt. 5-6 ¶ 22). All the protesters reject the BOP's suggestion. (Dkt. 5-1 ¶ 23; Dkt. 5-2 ¶ 26; Dkt. 5-3 ¶ 25; 5-4 ¶ 19; Dkt. 5-5 ¶ 22; Dkt. 5-6 ¶ 22; 5-7 ¶ 22).

Instead, they all wish to conduct their vigil at the site contiguous to the Family Dollar, across from the entrance to the prison. (Dkt. 5-1 ¶ 24; Dkt. 5-2 ¶ 27; Dkt. 5-3 ¶ 26; Dkt. 5-4 ¶ 20; Dkt. 5-5 ¶ 23; Dkt. 5-6 ¶ 23; Dkt. 5-7 ¶ 23). This is certainly not an unusual desire or request. For example, plaintiff Ashley Eve has engaged in vigils against executions in other prisons where protesters were allowed to assemble immediately outside of the main entrance to the prison, which caused no safety or other problems. (Dkt. 5-1 ¶ 26) This included a protest outside the Indiana Department of Correction's Indiana State Prison. (*Id.*). Given that executions are now being scheduled and taking place at an ever-increasing rate, it is particularly important for the protesters to be present in sight of the prison, where they can be seen, to hopefully focus renewed attention on the death penalty and why it should be abolished. (*Id.* ¶ 4).

**The preliminary injunction standard**

The Seventh Circuit has noted that

> [t]o obtain a preliminary injunction, a plaintiff must first show that: (1) without such relief, it will suffer irreparable harm before final resolution of its claims; (2) traditional legal remedies would be inadequate; and (3) it has some likelihood of success on the merits. If a plaintiff makes such a showing, the court next must weigh the harm the plaintiff will suffer without an injunction against the harm the defendant will suffer with one. This assessment is made on a sliding scale: The more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor. Finally, the court must ask whether the preliminary injunction is in the public interest, which entails taking into account any effects on non-parties. Ultimately, the moving party bears the burden of showing that a preliminary injunction is warranted.

*Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1068 (7th Cir. 2018) (citations and quotation marks omitted), *cert. denied*, --U.S.--, 140 S. Ct. 384 (2019).

**Argument**

**I. The protesters are likely to prevail on their claim that the restrictions on their expressive activity violate the First Amendment**

**A. The protesters wish to engage in expressive activity in a traditional public forum, where their First Amendment rights are greatest**

The protesters wish to exercise their expressive rights on the grassy right of way abutting a Dollar General store at the intersection of Prairieton Road and West Springhill Drive. While this location is still a distance from the prison grounds and an even greater distance from the execution chamber, given the geography surrounding USP Terre Haute it is a location where their speech will be meaningful as they will be able to see the prison

as they engage in their protest and vigil opposing the executions. Of course, "cases have recognized that the standards by which limitations on speech must be evaluated differ depending on the character of the property at issue." *Frisby v. Schultz*, 487 U.S. 474, 479 (1988) (internal quotation and citation omitted). "Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague v. CIO*, 307 U.S. 496, 515 (1939). Public streets, sidewalks, and parks, therefore, represent the archetypal traditional public fora. *See Frisby*, 487 U.S. at 480-81; *Weinberg v. City of Chicago*, 310 F.3d 1029, 1035 (7th Cir. 2002).

Merely because expressive activity takes place in a public forum does not mean that the government may not impose any restriction or regulation on the activity. Rather, the Supreme Court has held that, in a public forum,

> the government may not prohibit all communicative activity. For the state to enforce a content-based exclusion it must show that the regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end. The state may also enforce regulations of the time, place, and manner or expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication.

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983) (internal citations omitted). The restrictions on the protesters' expressive activity at issue in this litigation are content neutral, for on execution days persons are not permitted near USP Terre Haute regardless of the message they wish to express. Nonetheless, this restriction fails

under "time, place, and manner" analysis: it is not narrowly tailored to serve a significant governmental interest, nor does it leave the protesters ample alternative channels to exercise their First Amendment rights.

### B. The restriction at issue in this litigation is not narrowly tailored to serve a significant governmental interest

When executions take place in states that allow for the death penalty, photographs and video footage of persons performing peaceful vigils or expressing their opposition to capital punishment immediately outside the prison walls are virtually ubiquitous. *See, e.g.*, Liliana Segura, *"One by One They're Dying": Activists Protest Tennessee's Fifth Execution in a Year*, The Intercept, Aug. 17, 2019, *available at* https://theintercept.com/2019/08/17/tennessee-death-penalty-protests; Tamir Kalifa, *Executions Are So Common, Even Protesting Them Has Become Routine*, Texas Monthly, Nov. 12, 2013, *available at* https://www.texasmonthly.com/the-culture/executions-are-so-common-even-protesting-them-has-become-routine (both articles last visited Aug. 1, 2020). Indeed, Ashley Eve has protested at execution sites other than in Terre Haute, including at the Indiana State Prison, where protesters were allowed to gather immediately outside the prison without safety or other problems. (Dkt. 5-1 ¶ 26).[4] But when the federal government began

[4] Rev. Breeden, one of the protesters, was actually able to stand vigil at the desired site, at the intersection of Springhill Drive and Prairieton Road because the first execution, planned for July 13, 2020, was delayed to the morning of the 14th. (Dkt. 5-3 ¶ 20). Although he, along with the other protesters, were restricted by the barricades on the 13th, the barriers were down when he

executing persons for the first time in seventeen years, ISP erected a no-protest zone that extends nearly two miles outside USP Terre Haute (and even further from the execution chamber at that facility). Of course, ISP has not yet articulated an interest that it believes to be served by the erection of barricades prohibiting the protesters from coming within 1.6 miles of the entrance to USP Terre Haute. No interest, however, is apparent. Courts resolving challenges to no-protest zones have generally assessed whether government-imposed restrictions were necessary to advance an interest in preventing pedestrian congestion (*see, e.g.*, *Weinberg v. City of Chicago*, 310 F.3d 1029, 1038-40 (7th Cir. 2002)) or in ensuring the physical safety of public figures or others (*see, e.g.*, *Blair v. City of Evansville*, 361 F. Supp. 2d 846, 856-58 (S.D. Ind. 2005)). Neither of these interests, however, is remotely applicable here: the no-protest zone covers miles of public roads even though executions themselves take place in a discrete, highly secure location. As seems evident from the manner in which protest activities are permitted when executions occur in other locations, it does not appear that a significant governmental interest exists that might justify the erection of a no-protest zone in the first place.

But even if a governmental interest justified some limitation on the protesters' speech, there is absolutely no interest served by prohibiting them from such an enormous

---

approached the prison very early on the morning of the 14th and he was able to stand at the desired site. (*Id.* ¶¶ 15-16, 17-20).

swath of public property. Even under circumstances where a clear interest in imposing *some* restriction on speech existed, courts have not hesitated to invalidate far smaller no-protest zones. For instance, in *Blair* a no-protest zone—which allowed protesters access to an area 500 feet from the entrance—was erected around a site at which then-Vice President Cheney was to appear. 361 F. Supp. 2d at 856-57. While this Court acknowledged that protecting the Vice President was a governmental interest of surpassing importance, the sheer distance from the event to which protesters were relegated rendered the no-protest zone excessive:

> [T]he restriction of protesters to an area 500 feet away from the only entrance used by attendees, and on the opposite end of the building from where Vice President Cheney would enter the facility and from where the majority of people attending the event would park, burdened speech substantially more than was necessary to further the Defendants' goals of safety. Defendants contend that this was a necessary precaution because they needed to "maintain the possibility of emergency ingress and egress, and the presence of individuals or groups standing in the area [outside the security zone] could impede such access." But this reason just repeats the justification for having a "security zone" or "no-protest zone" in the first place. It does not add an additional danger or articulate why demonstrators needed to be corralled 500 feet from the only entrance open during the Vice President's visit. Defendants articulated no particularized threat to the Vice President or the event itself to justify the large distance between the protest zone and the intended audience.

*Id.* at 858 (internal citation omitted). The Seventh Circuit in *Weinberg* similarly concluded that a 1,000-foot restriction on peddling around the United Center in Chicago "overcompensates for an alleged congestion problem on the sidewalks." 310 F.3d at 1040. Other courts have held unconstitutional similar restrictions. *See, e.g., Kuba v. 1-A Agric.*

*Ass'n*, 387 F.3d 850, 861-63 (9th Cir. 2004) (free-speech zones located between 200 and 265 feet from the entrance to the Cow Palace); *Bay Area Peace Navy v. United States*, 914 F.2d 1224, 1227-29 (9th Cir. 1990) (no-protest zone extending 75 yards from pier hosting Fleet Week).

The no-protest zone at issue in this case is more than eight times larger than the 1,000-foot restriction invalidated in *Weinberg*. It is approximately seventeen times larger than the 500-foot restriction that this Court invalidated in *Blair*. And it is between thirty and forty times larger than the restrictions that the Ninth Circuit invalidated in *Kuba* and *Bay Area Peace Navy*. At the same time, the traffic-congestion and public-safety rationales that purportedly justified the restrictions on expressive activity in each of those cases appear to be completely lacking here. ISP's no-protest zone is not narrowly tailored to advance a significant governmental interest.

**C. The restriction at issue in this litigation does not leave the protesters with ample alternative channels to exercise their First Amendment rights**

But it is not enough that a content-neutral regulation on expressive activity in a traditional public forum be narrowly tailored to advance a significant government interest; it must also leave the protesters with ample alternative channels to exercise their First Amendment rights. *See, e.g., Perry Educ. Ass'n*, 460 U.S. at 45. "Whether an alternative is ample should be considered from the speaker's point of view." *Weinberg*, 310 F.3d at 1041. Thus, while "[a]n adequate alternative does not have to be a speaker's

first choice . . . an alternative is not adequate if it forecloses a speaker's ability to reach one audience even if it allows the speaker to reach other groups." *Id.* (internal citations, quotation, and alteration omitted). Here, ISP allows two supposed alternatives: protesting alongside U.S. Highway 41 nearly two miles from the prison complex, or being bussed in to a fenced "pen" within the complex itself. Neither alternative, however, is "ample."

First, protesting alongside U.S. Highway 41—where the plaintiffs were located for the July executions—is clearly not an ample alternative. It should require no citation to demonstrate that requiring death-penalty protesters to congregate on and near the property of a car dealership alongside a busy state highway does not represent an adequate alternative for the exercise of First Amendment rights. Even ignoring both the possibility that this option may not even be available to the protesters at the time of the next execution (as it depends, at least in part, on the goodwill of the property owner) and the difficulties inherent in expressing any message to vehicular traffic travelling at high rates of speed (let alone conducting a vigil under those circumstances), the highway is more than 1.5 miles from the prison at USP Terre Haute where the protesters wish to direct their expressive activity. In *Weinberg*, the 1,000-foot no-protest zone was deemed inadequate because it did not allow the plaintiff to reach his intended audience: "Blackhawks fans entering the United Center." *See id.* at 1042. The 500-foot no-protest zone in *Blair* also "significantly curtailed [the plaintiff's] ability to convey his message to

one of his major targets—the event patrons." 361 F. Supp. 2d at 859. So too here. Requiring the protesters to protest nearly two miles away entirely curtails their ability to reach their audience of persons participating in the first federal executions to take place since 2003. It also dulls the power of the message itself to other persons: the image of persons protesting and holding vigil alongside a car dealership on a state highway hardly compares to the image of persons doing the exact same thing outside the entrance to a federal prison.

Nor does the fenced-in area erected by the Bureau of Prisons on prison property represent an ample alternative. This fenced-in area is a great distance removed from both the execution chamber and the entrance to the prison complex, and it therefore suffers from the same constitutional defects as does the car dealership on U.S. Highway 41. But it also suffers from profound practical flaws. "[T]he simple fact that [a plaintiff] is permitted to communicate his message elsewhere does not end [the] analysis if the intended message is rendered useless or is seriously burdened." *Weinberg*, 310 F.3d at 1041 (citations omitted). The burdens felt by any protester who chooses to make use of this fenced-in area are sufficient to deter all but the most tenacious protester. Not only must a protester commit to being bussed into this area hours before an execution (a method of transportation that is itself risky given the current pandemic), but she must commit to remaining in that area until after the execution is carried out—which may or may not occur on schedule given the possibility of last-minute appeals. And she must

commit to remaining in that area without food, without a camera, without a cell phone, with restrictions on many types of signage, with limited shelter from the summer heat, and with only a portable toilet, drinking water, and hand sanitizer available to her. Particularly given the fact that many of the plaintiffs (and the members of the organizational plaintiffs) are elderly and are therefore unable to remain in the heat for an extended period of time, the fenced-in area on prison grounds is no alternative at all.

Given ISP's erection of a 1.6-mile no-protest zone, the protesters are not left with any ample alternative means to communicate their message.

## II. The other factors for the grant of a preliminary injunction are met here

1. Irreparable harm for which there is no adequate remedy at law The Supreme Court has stressed that the violation of the First Amendment, for even "minimal periods of time," is "unquestionably . . . irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion). Given this, "money damages are therefore inadequate." *Joelner v. Village of Washington Park. Ill.*, 378 F.3d 613, 620 (7th Cir. 2004) (citation omitted). "[I]njunctions are especially appropriate in the context of first amendment violations because of the inadequacy of money damages." *National People's Action v. Village of Wilmette*, 914 F.2d 1008, 1013 (7th Cir. 1990) (citing *Flower Cab Co. v. Petitte*, 685 F.2d 192, 195 (7th Cir. 1982)). Only an injunction will allow plaintiffs to be able to fully exercise their First Amendment rights here.

2. The balance of harms Without an injunction, the plaintiffs are faced

with a continuing violation of their essential First Amendment rights. As the Seventh Circuit has noted, if the government "is applying [a] policy in a manner that violates [] First Amendment rights. . . then [the government's] claimed harm is no harm at all." *Christian Legal Society v. Walker*, 453 F.3d 853, 867 (7th Cir. 2006). The ISP faces no harm at all.

3. The public interest "The vindication of constitutional rights serves the public interest." *Planned Parenthood of Indiana & Kentucky, Inc. v. Commissioner*, 194 F. Supp. 3d 818, 836 (S.D. Ind. 2016) (citing *Joelner*, 378 F.3d at 620; *Preston v. Thompson*, 589 F.2d 300, 303 n.3 (7th Cir. 1978)). Thus, the public interest is served by the enforcement of the Constitution and by the grant of a preliminary injunction here

4. The bond requirement The issuance of a preliminary injunction will not impose any monetary injuries on the ISP. In the absence of such injuries, no bond should be required. *See, e.g.*, *Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996).

**Conclusion**

A preliminary injunction must therefore issue, without bond, to allow the protesters to engage in their First Amendment expression on the property opposite the entrance to the Federal Correctional Complex in Terre Haute, at the intersection of West Springhill Drive and Prairieton Road.

Kenneth J. Falk
Gavin M. Rose
Stevie J. Pactor

ACLU of Indiana
1031 E. Washington St.
Indianapolis, IN 46202
317/635-4059
fax: 317/635-4105
kfalk@aclu-in.org
grose@aclu-in.org
spactor@aclu-in.org

Attorneys for Plaintiffs

**Certificate of Service**

I hereby certify that on this 4th day of August 2020, a copy of the foregoing was filed electronically with the Clerk of this Court and was served on the below-named persons by first class U.S. postage, pre-paid.

Superintendent
Indiana State Police
IGCN
100 N. Senate Ave.
Indianapolis, IN 46204

Kenneth J. Falk
Attorney at Law